**VACCARO v. COLLIER, United States Marshal.**

District Court, D. Maryland.

Feb. 20, 1930.

A. W. W. Woodcock, U. S. Atty., and Stanley E. Hartman and William C. Purnell, Asst. U. S. Attys., all of Baltimore, Md., for petitioner.

Albert F. Flint, of Boston, Mass., and Huntington Cairns, of Baltimore, Md., Counsel for British Consul, for respondent.

WILLIAM C. COLEMAN, District Judge.

This case arises on petition for a writ of habeas corpus. The petitioner, Sarro Vaccaro, a native-born American citizen, was apprehended on February 11, 1930, on the warrant of the United States Commissioner at Baltimore, on complaint made, under oath, by the British Consul at Baltimore, to the effect that Vaccaro, on the 29th of May, 1925, at Hereford, a town in the District of St. Francis, in the Province of Quebec, Canada, a short distance from the northern boundary of the state of Vermont, murdered one Amedee Bilodeau; also, that at the same time and place, Vaccaro kidnapped one Robert Andrew Price, with intent unlawfully to transport him out of the Dominion of Canada against his will; and, third and lastly, that at the same time and place, Vaccaro was guilty of the theft of a motorcar belonging to Adelphine Begin, formerly the wife of Bilodeau. Before the Commissioner, Vaccaro pleaded not guilty to all of the charges. A hearing was granted, as a result of which the Commissioner found the evidence sufficient to sustain the first two charges, namely, that of murder and kidnapping, but not the third, namely, larceny of the car, and issued his warrant for commitment of Vaccaro to jail pending his surrender upon requisition by the proper authorities of the Canadian government. In this proceeding the Commissioner acted under section 5270 of the Revised Statutes (18 USCA § 651), which provides as follows: "Whenever there is a treaty or convention for extradition between the Government of the United States and any foreign government, any justice of the Supreme Court, circuit judge, district judge, or commissioner, authorized so to do by any of the courts of the United States, or judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within the limits of any State, District, or Territory, with having committed within the jurisdiction of any such foreign government

any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or commissioner, to the end that the evidence of criminality may be heard and considered. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made."

■ The sole question raised by the present petition is whether or not the United States Commissioner acted legally in committing Vaccaro to jail. In determining this question, it is well settled that the court is restricted to a consideration of three things: First, did the Commissioner have jurisdiction of the subject-matter and of the accused? Second, are the offenses charged within the provisions of a treaty existing at the time in question between the United States and Canada? Third, did the evidence upon which the Commissioner acted warrant a finding that there was reasonable ground to believe the accused guilty on the first two charges, or either of them? Fernandez v. Phillips, 268 U. S. 311, 45 S. Ct. 541, 69 L. Ed. 970, and cases cited.

In addition to Vaccaro's testimony before the Commissioner, there was produced testimony of five others on his behalf: Mr. Amey, the United States attorney for the district of Vermont; Mr. Yutronich, federal narcotic agent from Boston; Mr. Allen, federal narcotic agent in charge of the Detroit division, and Vaccaro's superior officer at the time of the alleged offenses; and two other narcotic agents, Pacetta and Manning, operating out of New York City. None of these was an eyewitness to what took place. Four photographs, taken about eight months after the occurrence, of various persons and motorcars, simulating their various positions at the time in question, were also introduced. The Commissioner also received in evidence as having been properly authenticated pursuant to the provisions of the Revised Statutes, § 5271 (18 USCA § 655), a certificate of the official autopsy performed upon the body of Bilodeau, to the effect that he died of a bullet wound in the abdomen; a certificate of his burial, and depositions of the seven following persons: Robert A. Price, the person whom Vaccaro is alleged to have kidnapped; Mrs. Begin, formerly the wife of Bilodeau, with whose death Vaccaro is charged; Valenti, the proprietor of the Line House, the hotel at the border, outside of which the shooting and alleged kidnapping took place; Couturier, innkeeper for Valenti; Van Dyke and Harriman, American business men who happened to be in the Line House at the time in question; and, lastly, Dr. Kerr, to whom Bilodeau was brought after being mortally wounded, and in whose presence he died before any medical aid could be rendered. Other than Price, none of these was an eyewitness to what occurred. Accompanying these depositions were photographs taken in front of the Line House shortly after the affair (exactly when, not being shown), with motorcars and with Price, Valenti, Van Dyke, and Harriman simulating in person the respective locations of the cars and participants in the affray.

The following material facts disclosed by the evidence before the Commissioner are not contradicted. Pursuant to an agreement had with one Cowan in charge of narcotic investigations for the Canadian government, Allen, who was then United States narcotic agent in charge of the territory lying along the border between Vermont and Canada, sent the petitioner, Sarro Vaccaro, into Canada some time during the month of May, 1925, in the capacity of what is commonly known as an informer, and also sent a regular agent named Mertz, as Vaccaro's superior, for the purpose of investigating and causing the apprehension of two persons, Price and Bilodeau, whom investigations indicated were engaged in smuggling narcotics from Canada into the United States. By concealing their identity, and representing themselves as delegated to purchase narcotics for a certain wealthy American individual or individuals, Vaccaro and Mertz made the acquaintance of Price and Bilodeau, went with them to Montreal, where they induced Price and Bilodeau to buy for them a considerable quantity of opium and morphine, valued at $1,000, from certain Chinese there, and entered into an agreement with them whereby it was to be delivered into the United States and there purchased by Mertz and Vaccaro. Price declined to cross the border because he had been previously convicted of a violation of the Harrison Narcotic Law (26 USCA §§ 211, 691–

707) and had been deported. Bilodeau, after some hesitancy, consented to come across the border with Mertz and Vaccaro, carrying a small quantity of the drug with him, it being arranged that the major portion of the drug was to be brought over in a separate automobile by one Nadeau, a friend of Price and Bilodeau. Pursuant to agreement, all parties met at West Stewartstown in Vermont. There the drugs were delivered, Mertz and Vaccaro disclosed their identity, and forthwith arrested Nadeau and Bilodeau without resistance. Thereupon Bilodeau, apparently feeling that his arrest was due to his betrayal by Price, gave his consent to Vaccaro and Mertz to go back to the border and assist them in apprehending Price. The three proceeded back to the point where they had crossed the line on the northern boundary of Vermont, near the village of Hereford in the Province of Quebec, and not far from the village of Canaan in the state of Vermont. The border there is a straight line defined by the Webster-Ashburton Treaty of 1842 (8 Stat. 572), and later surveys. At the point in question and directly on the boundary, so that part of it is in Canada and part in the United States, is the roadhouse known as the Line House, operated by Valenti, and in the road opposite this house is a stone monument marking the line between the two countries.

When Vaccaro and Mertz returned with Bilodeau to the Line House, they found Price on the outside. By previous arrangement, they represented to him that Nadeau had cheated them, had got their money but would not surrender the narcotics, and they endeavored to get Price to telephone Nadeau. All four persons were then standing in the roadway outside the Line House. Thereupon Vaccaro and Mertz saw Bilodeau put both his hands upon the lapels of his coat, which, as their experience told them, was a signal that officers of the law were present, and meant that resistance or attempted escape might be anticipated, whereupon Vaccaro called to Mertz to hold Bilodeau, which he attempted to do, and Vaccaro grabbed Price. Price drew a razor which Vaccaro and Mertz had seen previously in his possession. Vaccaro struck the razor from Price's hand, at the same time knocking him down. Simultaneously, or almost simultaneously, Bilodeau struggled to get away from Mertz, and as he did so, Mertz, who was armed with a revolver, shot him, and as he continued to run in a crouching position Mertz shot three or four times more. Bilodeau fell, a further struggle ensued between Price and Vaccaro,

and finally Vaccaro put Price in the car in which he (Vaccaro) had just arrived with Mertz and Bilodeau, and Mertz put Bilodeau in another car. Both proceeded to West Stewartstown, where Price was put in jail. Bilodeau was taken to Dr. Kerr's office near by, but died almost immediately upon arrival, and before any medical assistance could be rendered. Bilodeau was not armed—a fact known to Vaccaro and Mertz. Vaccaro was armed but never fired a shot. On October 4th following, one Philias Lanctot, a high constable of the District of St. Francis in the Province of Quebec, swore out a complaint in that district before the district magistrate, charging Vaccaro with the offenses which are the basis of the present controversy. Four years later, that is, in May and June, 1929, the depositions heretofore referred to were taken as part of an inquest to substantiate the complaint. Bilodeau's wife had previously made a claim against the United States government for compensation for her husband's death, which has not been settled.

By far the major portion of the testimony taken before the Commissioner, and a large part of the depositions, are composed of conflicting and indeed irreconcilable statements from the various witnesses as to where the four participants, namely, Vaccaro, Mertz, Price, and Bilodeau, were standing just before, during, and at the termination of the struggles, and of the shooting which ended in the mortal wounding of Bilodeau, and in the forcible arrest of Price and his carriage across the border; all of which involved a great deal of evidence respecting the exact location of the boundary line between the United States and Canada at this point. In fact, a large part of the argument of counsel on both sides was devoted to a discussion of these questions, the answers to which are by no means conclusive of the real issues involved, as will later be shown.

We now come to a consideration of the three points to which the review of this court is restricted, namely, did the Commissioner have jurisdiction of the subject-matter and of the accused; second, were the offenses charged within the provisions of a then existing treaty between the United States and Canada; and, third, did the evidence upon which the Commissioner acted warrant a finding that there was reasonable ground to believe Vaccaro guilty on the first two charges, or either of them? We will take up these points in the order named.

■ First, there can be no question that the Commissioner had jurisdiction of the subject-matter and of the accused. The Supreme Court has ruled that jurisdiction in such cases must be expressly given to the Commissioner. Grin v. Shine, 187 U. S. 183, 23 S. Ct. 98, 47 L. Ed. 130. Such was expressly given by order of this court to Commissioner Supplee, prior to his issuance of the warrant. The accused was within the Maryland district when apprehended.

■ Passing next to the question whether the offenses charged are within the provisions of a then existing treaty between the United States and Canada, it is clear that they are. The Treaty of 1842 (8 Stat. 572), commonly known as the Webster-Ashburton Treaty between the United States and Great Britain, provides as follows in article 10: "It is agreed that the United States and Her Britannic Majesty shall, upon mutual requisitions by them, or their ministers, officers, or authorities, respectively made, deliver up to justice all persons who, being charged with the crime of murder, or assault with intent to commit murder, or piracy, or arson, or robbery, or forgery, or the utterance of forged paper, committed within the jurisdiction of either, shall seek an asylum, or shall be found, within the territories of the other: Provided that this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial, if the crime or offence had there been committed: and the respective judges and other magistrates of the two Governments shall have power, jurisdiction, and authority, upon complaint made under oath, to issue a warrant for the apprehension of the fugitive or person so charged, that he may be brought before such judges or other magistrates, respectively, to the end that the evidence of criminality may be heard and considered; and if, on such hearing, the evidence be deemed sufficient to sustain the charge, it shall be the duty of the examining judge or magistrate to certify the same to the proper Executive authority, that a warrant may issue for the surrender of such fugitive. The expense of such apprehension and delivery shall be borne and defrayed by the party who makes the requisition, and receives the fugitive." Article 1 (Treaty of July 12, 1889, 26 Stat. 1508), recites that "the provisions of the said Tenth Article are hereby made applicable to the following additional crimes," and kidnapping is among those enumerated.

■ It is to be noted that section 5270 of the Revised Statutes (18 USCA § 651), under which the Commissioner acted, adopts the provisions of the treaty, and the treaty itself provides that the Commissioner shall commit only upon two conditions; first, that the person sought to be extradited shall have been charged under oath with having committed, within the jurisdiction of the extraditing nation, one or more of the specially designated crimes, and shall seek an asylum or be found, within the limits of the other nation; and, second, that there shall be such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial if the crime or offense had there been committed; in other words, in the present case the law of Maryland and not that of Canada is specifically declared to govern. Having found, then, that murder and kidnapping are among the crimes provided for by the treaty or convention, it becomes necessary next to determine whether the statutes or the common law of the state of Maryland (for by such are the present issues to be governed according to the language of both the treaty and the extradition statute, aside from the fact that federal jurisdiction in criminal cases is statutory and there is no federal statute governing the offenses here involved) would justify, upon the evidence presented to the Commissioner, Vaccaro's apprehension and commitment for trial had these offenses been committed in Maryland; or, which is tantamount to the same thing, would justify the conclusion that there would be reasonable ground to believe Vaccaro guilty as charged had these offenses been committed in Maryland.

By the law of Maryland "murder" is defined as follows (article 27, § 397, Maryland Code): "All murder which shall be perpetrated by means of poison, or lying in wait, or by any kind of willful, deliberate and premeditated killing shall be murder in the first degree." After defining various types of murders with which we are not here concerned, the law further provides (section 401): "All other kinds of murder shall be deemed murder in the second degree."

"Kidnapping" is defined as follows (article 27, § 316, Maryland Code): "Every person, his counsellors, aiders or abettors, who shall be convicted of the crime of kidnapping and forcibly or fraudulently carrying or causing to be carried out of this State any person with intent to have such person carried out of this State, shall be sentenced

to the penitentiary for not more than twenty-one years."

▮▮▮ The court finds, first, that the contention of counsel for the Canadian government is sound to the effect that this proceeding cannot be used as a means for rehearing what the Commissioner has already decided, or for hearing additional evidence; that it cannot take the place of a writ of error; that form in the proceedings before the Commissioner is not to be insisted upon, beyond the requirements of safety and justice; and that competent evidence to establish reasonable ground to believe the accused guilty is not necessarily evidence competent to convict. Fernandez v. Phillips, supra.

▮▮▮ Secondly, the court finds that, tested by the foregoing rules, the evidence regarding the exact situs of the boundary line and the positions of the four participants in the affair, considered as a whole with all due allowance for extreme bias, and for erroneous statements, doubtless some made honestly, others dishonestly, on both sides, amply warranted the Commissioner in believing that Mertz shot Bilodeau while the latter was in Canada, that is to say, that the homicide took place in Canada; and also that Price was in Canada when Vaccaro overpowered him and took him to, or placed him in, the motorcar in which he carried him to jail across the border. But such preliminary findings cannot be conclusive of the fundamental issue, which is whether the Commissioner, on the evidence presented, had reasonable ground to conclude, as he did, (a) that neither the killing of Bilodeau, nor the forcible arrest and transportation of Price into the United States was legally justifiable, and (b) that Vaccaro was an accomplice in the killing.

We have seen that the following facts are uncontroverted. First, Vaccaro was sent into Canada with the knowledge and consent of the Canadian government; his superior, Allen, as well as Vaccaro himself, so testified, and this testimony is uncontradicted. Second, Price and Bilodeau effected the transportation of the drugs into the United States. Third, such transportation was in violation of the law of the United States and constituted a felony. Fourth, Bilodeau gave a signal, which Mertz and Vaccaro had every reasonable ground to believe was a signal for attempted resistance or escape. Fifth, Vaccaro fired no shot. And, sixth, Price had a criminal record, had no firearms on his person, but carried a razor.

▮▮▮ The following principles of the criminal law are axiomatic and prevail as the common law of Maryland which, as we have seen, by the express terms of the treaty, controls. First, though an officer may not kill for the purpose of preventing an escape where the party is in custody for a misdemeanor, yet if such party assault the officer with such violence that he has reasonable ground for believing his life to be in peril, the officer is justified in killing such party. It is homicide, made justifiable by self-defense. Second, any one, whether an officer clothed with authority to make arrests or a private person, may arrest any one, at any time, whom he finds in the commission of a felony, or who he has reasonable ground to believe has committed a felony. Third, all reasonable force to effect such arrest may be used, and if such person when arrested, or sought to be arrested, tries to escape, the officer is justified in killing him if such be necessary to prevent his escape. Baltimore & Ohio R. Co. v. Strube, 111 Md. 119, 73 A. 697.

Applying the foregoing principles to the uncontroverted facts above enumerated, the court is forced to the inevitable conclusion that there was no reasonable ground for declaring Vaccaro guilty either of complicity in the killing of Bilodeau, or of such conduct in connection with the arrest and transportation of Price as was tantamount to kidnapping him, unless the prior conduct of Mertz and Vaccaro in inducing the illegal transportation and sale of the narcotics in the United States by Bilodeau and Nadeau, in which Price assisted, was itself unlawful—a point which will shortly be considered.

▮▮▮ First, as to the killing of Bilodeau, it is to be noted that the Commissioner had before him the testimony of only one eyewitness, and that was by deposition only, namely, the deposition of Price. The charge against Vaccaro is not that he himself killed Bilodeau, because it is uncontradicted that he fired no shots, but that he was involved in the killing of Bilodeau in that he was an accessory, an accomplice of Mertz in the killing. Unquestionably in contemplation of law, every confederate or accomplice is responsible for a crime which is the probable and natural result of the confederacy, unless such crime be committed without his connivance or assent. But mere sympathy cannot in and of itself constitute a confederacy. On the other hand, no matter how wide may be the separation of the confederates, if they are all engaged in a common plan for the execution of

a felony, and all take some part in the furtherance of it, all are liable. It is not necessary that the principal should know all the conditions of the help rendered to him, but it is a prerequisite that the accessory or accomplice shall know the guilty purpose, and with such knowledge, shall, in some way, have assisted in its being carried out, or in an attempt to carry it out. Wharton on Criminal Law (11th Ed.) vol. 1, § 249 et seq.

 Tested by these principles, the court is unable to find on the evidence before the Commissioner that Vaccaro was an accomplice in the killing of Bilodeau. It is true Vaccaro and Mertz were acting under instructions "to knock off" both Bilodeau and Price within the confines of the United States, and if this could not be accomplished, then to do so across the border. But these instructions, so far as the evidence discloses, meant simply to arrest, and were so understood by Vaccaro and Mertz; the phrase "knock off" being the vernacular for "arrest," in common use among Canadian and United States government officials in dealing with the criminal class generally. It is also true that Vaccaro called out to Mertz, just before the latter fired, to get Bilodeau, but taking Price's own version of what was said, namely, that Vaccaro exclaimed, "Don't let him get away," to which Mertz replied, "I have got him," such does not in any way indicate a prearrangement, a plan of any sort, between Vaccaro and Mertz to shoot Bilodeau. Whether Mertz was justified individually in doing what he did is a question with which the Commissioner was not permitted to concern himself except in so far as was necessary in order to determine Vaccaro's guilt. It must be conceded that if Mertz was not justified on the ground of preventing the escape of a felon, or in self-defense, in shooting Bilodeau as he did, he would be guilty of murder. Unlawful homicide is divided into two general classes, murder and manslaughter. Murder is the unlawful killing of a human being with malice aforethought. What do we mean by malice aforethought? This is a technical expression, variously and often confusedly defined. For the purpose of this case, it is sufficient to say that it denotes a state of mind that is without regard for human life. Such disregard has, of course, its mental extremes. At one extreme, we may find hatred, deliberate premeditation; at the other, merely a reckless disregard for human life. Therefore, in order for one to be guilty of murder, it is not necessary that he have malice against the deceased in the sense of enmity or hatred or ill feeling; for, when one without legal excuse so uses a deadly weapon that the death of a human being results therefrom, the law infers disregard of human life, that is, malice aforethought, and judges the act to be murder. On the other hand, if hatred or deliberate premeditation exists, we also have murder. So, in order to distinguish between the degree or gravity of the crime, Maryland, like other states, has defined by statute degrees of murder; that is, it has provided that there shall be murder in the first degree and murder in the second degree. The Maryland law defines certain specific kinds of murders as murders in the first degree, and all other kinds as murders in the second degree; and declares that all murders that shall be perpetrated by any kind of willful, deliberate, and premeditated killing, shall be murder in the first degree.

There is a total lack of evidence such as would bring Vaccaro within the aforegoing definitions of murder in either the first or second degree, because from whatever angle we approach Vaccaro's connection with the affray, we find no evidence to surmount or overcome the two controlling facts, first, that Vaccaro fired no shots himself; and, second, that his statement to Mertz not to let Bilodeau get away, or anything that he said or did, was not evidence of a mutual understanding that Mertz should ever use his revolver wantonly, or in disregard of human life.

Bilodeau and Price were both experienced in the devious and dangerous methods common to the criminal class of society. The former had been convicted of violating the Harrison Narcotic Act (26 USCA §§ 211, 691–707). Both Mertz and Vaccaro knew these things. They also well knew the meaning of the signal for resistance or escape which was given. There is no denial in the evidence either that such signal was given, or that it was intended to mean what Vaccaro and Mertz understood it to mean. We may assume that Mertz was the aggressor; that he seized Bilodeau before the latter made any threat or attempt to escape. Even if we should go further and assume, without deciding—for it is not necessary so to decide—that Mertz was not justified in firing as and when he did, the causal connection between Vaccaro and this act of Mertz remains lacking. Vaccaro's action towards Price, which we will consider in a moment, and the fact that there was every motive to capture both Bilodeau and Price and bring them not dead, but alive, into the United States, also tends strongly to negative any intent to kill if the same might reasonably be avoided. Paren-

thetically, it may be pointed out that undoubtedly it is the law that even though Mertz was justified in firing one or more times at Bilodeau, and in so doing mortally wounded him, he would not have been justified in deliberately advancing while Bilodeau was down and helpless and no longer retreating or able to retreat, and in shooting him further. But here again it is quite apart from the present issue to analyze the evidence respecting the number of times and the circumstances under which Mertz fired, unless connivance of some sort by Vaccaro is established.

 Turning next to the charge of kidnapping, namely, to the methods adopted by Vacarro in overpowering and carrying Price back into the United States, the court fails to find any of the elements of kidnapping as that offense is defined and understood by the law of Maryland. Vacarro saw the unmistakable signal given by Bilodeau; regardless of this, he would have been justified in forthwith arresting Price, because he knew he was twice a felon; he knew Price might do him serious bodily harm with the razor which he had; Price did attempt to do so when his arrest was sought. Therefore, Vaccaro was entirely justified in completely overpowering him as he did, in "knocking him out," and the taking of him forcibly in the car to the jail at West Stewartstown was equally justified. The crime of kidnapping, as defined by the Maryland Code above quoted, presupposes that the seizure and the transporting out of the state by means of fraud or force, of the person seized, is unlawful; it obviously excludes any action that is legally justified. This is axiomatic. Besides, through the pictures in evidence it is disclosed that Price was back in Canada several months later, presumably, for aught that appears in the record, voluntarily released by the American to the Canadian authorities, or as a free agent, all of which would seem to indicate that the charge of kidnapping under the circumstances of the present case, is so palpably fictitious as to warrant no further consideration of the evidence, unless the manner in which Mertz and Vaccaro laid the plot for Bilodeau, Nadeau, and Price was unlawful— a question which will now be considered.

 It becomes necessary to understand fully what is meant by entrapment, and to what extent it may be resorted to. Whenever an officer of the law, by any plan or contrivance, causes a person to commit a crime, such official is said to entrap such person. We may assume that the particular offense would not have been committed except for the act of the officer. Nevertheless, if the person so entrapped was known to have, or was reasonably suspected of having, violated the law, such conduct on the part of the officer is lawful. Thus the apprehension of persons through decoys, through opportunity afforded to sell whisky, narcotics, or to do other illegal acts, has been generally upheld. Grimm v. United States, 156 U. S. 604, 15 S. Ct. 470, 39 L. Ed. 550; Newman v. United States (C. C. A. 4th Cir.) 299 F. 128; Hummelshime v. State, 125 Md. 563, 93 A. 990, Ann. Cas. 1917E, 1072. On the other hand, officers of the law may not induce persons, who it is not reasonable to suppose would otherwise violate the law, to do so, and then prosecute them. Public policy and fair play forbid going to such an extreme. The question, therefore, is always one of degree. A suspected person may be tested by being offered opportunity to transgress the law in such manner as is not unusual, but may not be put under any form of extraordinary temptation or inducement. Thus, since a morphine dealer usually deals with addicts, an officer, in testing such a supposed dealer, may properly pretend to be an addict, with such a person's common discomforts and craving for the drug, thereby giving color to the ruse, and he may offer a liberal price for the drugs and manifest persistence, for these things are common in such dealings. Similarly, when one is suspected of selling intoxicating liquor in violation of the law, the officer may represent himself as a customer and may do and say such things as would not be unusual in such a situation.

 Tested by the above principle, the court fails to find that Vaccaro, either individually or jointly with Mertz, illegally induced the transportation and sale of the narcotics by Bilodeau and Nadeau in which Price had a part, or illegally entrapped Price on his (Vaccaro's) return to the Line House. The court does not know to what extent, if any, the Commissioner was impressed with the theory of illegal entrapment. In this connection, it is proper for the court to refer to the fact that the Commissioner not only did not file any opinion giving his reasons for his conclusions, but stated that he felt he should adhere to his usual practice of not rendering opinions. It seems to the court that a case of this kind amply justified a departure from the Commissioner's custom. Certainly it would have been most helpful in view of the Commissioner's broad powers in the premises, the seriousness of the charges, the amount and character of the evidence, and the international relations involved.

Summarizing the court's conclusions, it finds that whereas the Commissioner did have probable cause for deciding that the shooting of Bilodeau and the apprehension of Price took place in Canada, the evidence did not justify Vaccaro's apprehension and commitment for trial either for murder or for kidnapping had what he did occurred within the state of Maryland. It would appear that the Commissioner—but here, again, the court can only speculate because no opinion giving his reasons has been filed—allowed the real issues in the case to be somewhat confounded in his own mind by the fact that Vaccaro and Mertz carried firearms and Price and Bilodeau did not, and also by his determination of where the affray took place, a determination, of course, of prerequisite importance, because unless Bilodeau was shot in Canada or Price apprehended there, no extraditable offense would have been committed; but, as has been pointed out, the question of the situs of the crime was merely preliminary to a determination of actual guilt.

Parenthetically, it seems proper for the court to remark that the soundness of the Commissioner's action in excluding certain testimony is open to question. While this court may not reverse on habeas corpus the Commissioner's finding if he had jurisdiction, if the offenses are within the treaty, and if he acted upon competent and adequate evidence, nevertheless the lack of competent and adequate evidence on which to base his finding in the present case is corroborated by the fact that certain evidence, which was excluded and which the court feels might properly have been admitted, notably, for example, the proffered testimony of Manning about Price, would tend further to justify Vaccaro's conduct. This being true, it becomes unnecessary to make more specific allusion to the excluded evidence.

Much has been said in argument before the court by the United States attorney, representing the accused petitioner, regarding a possible veiled motive for the attempt to prosecute him so long after the alleged offenses occurred, namely, almost five years later, and before Mertz has even been arrested, much less extradited and prosecuted. It is suggested that the real motive for the present extradition proceeding is to be found in the unsuccessful attempt on the part of Bilodeau's widow to obtain a satisfactory settlement with the United States government of her very substantial claim for damages on account of her husband's death. The court, in the absence of some direct evidence, can-

not assume that the extradition statute, and thereby the mutual good will between the United States and Canada, has been, or can ever be, subjected to any such abuse. There is no Maryland statute of limitations affecting the offenses here charged, and therefore the present extradition proceedings are not barred by lapse of time. · It does, however, seem proper for the court to remark upon the fact that more promptness in invoking the benefits of the extradition statutes, whenever it is proper to invoke them, is greatly to be desired. The confused and unreliable state of a large part of the evidence in the present case, making it increasingly difficult, if not impossible, to determine with any reasonable accuracy, numerous facts, is the best proof of what has just been stated.

The findings of the Commissioner are reversed, and accordingly the petitioner must be released.