## Extradition of MERTZ.
### Cr. No. 4731.

District Court, S. D. Texas, Galveston Division.

Aug. 8, 1931.

James B. & Chas. J. Stubbs and Theodore B. Stubbs, all of Galveston, Tex., for the Canadian government.

H. M. Holden, U. S. Atty., and M. S. McCorquodale, Douglas W. McGregor, and Albert Thomas, Asst. U. S. Attys., all of Houston, Tex., for defendant Mertz.

KENNERLY, District Judge.

This is an extradition proceeding brought by the Canadian government under chapter 20, title 18, USCA §§ 651–676, and under

the Treaty of 1842 between Great Britain and the United States of America (8 Stat. 572), for the extradition of Fred H. Mertz, alias Edward Parks, a United States narcotic officer, who is charged by complaint in the Dominion of Canada with the crime of murder, at Hereford, in the district of St. Francis, Dominion of Canada, on or about May 29, 1925. The person alleged to have been murdered was Amedee Bilodeau. During 1930, under the same or similar facts, a similar effort was made in this district to extradite Mertz upon the charge of murder, theft, and kidnapping. Upon a hearing before one of the United States commissioners of this court designated for that purpose, extradition was denied. A proceeding also similar to the present proceeding appears to have been instituted in the state of Maryland to extradite Sarro Vaccaro, also a United States narcotic agent, and who was in company with, and associated with, Mertz in the transactions leading up to, and connected with this charge. Vaccaro v. Collier (Opinion by Coleman, District Judge) 38 F.(2d) 862; Collier v. Vaccaro (Opinion by Parker, Circuit Judge), 51 F.(2d) 17.

The basis of this proceeding is a complaint made before me by the British Consul at Galveston, in the manner required by the treaty and by such statutes, charging the commission of murder by Mertz in Canada, and that he had escaped from Canada, and alleging him to be in this district. Warrant was issued for the arrest of Mertz, he was arrested in this district, brought before me, and hearing was had at Galveston on June 4, 1931.

The crime of murder is one of the crimes embraced in, and covered by, such treaty.

There are questions raised by objections and exceptions of the parties made and taken during the hearing, ruling upon which was reserved. It seems proper to first dispose of these questions.

■ 1. To sustain its case, the Canadian government offered the depositions of a dozen or more witnesses, together with numerous photographs, about which photographs the witnesses testify in the depositions. All these depositions are ex parte, and taken without cross examination by Mertz. They fully comply with section 655, title 18, USCA, but questions have arisen as to their legal effect.

Mertz claims that since one of the issues presented is whether the murder (if murder there be) was committed in Canada or in the United States, whatever the probative force of such depositions may be otherwise, they have no probative force, and are not admissible at this hearing, on that issue. This position is clearly untenable. U. S. Code, chapter 20, title 18, § 655 (18 USCA § 655); Bingham v. Bradley, 241 U. S. 511, 36 S. Ct. 634, 60 L. Ed. 1136; Rice v. Ames, 180 U. S. 371, 21 S. Ct. 406, 45 L. Ed. 577; Yordi v. Nolte, 215 U. S. 227, 30 S. Ct. 90, 54 L. Ed. 170; Collier v. Vaccaro (C. C. A. Fourth Circuit), 51 F.(2d) 17.

■ 2. The British government claims that the testimony of Mertz, and that of other witnesses offered by Mertz, is not admissible. The particular point is that it is claimed that such ex parte depositions clearly establish that Mertz murdered Bilodeau *in Canada*, and that Mertz's testimony, and that of his witnesses, cannot lawfully be received to show that such murder was committed *in the United States*. And that such testimony cannot lawfully be received to show that the killing of Bilodeau was an accident, or done under such circumstances, or in such manner, as not to be murder. Out of the great number of cases on this question, it seems to me that what is said by Mr. Justice Miller, in Benson v. McMahon, 127 U. S. 457, 8 S. Ct. 1240, 1243, 32 L. Ed. 236, and by Mr. Justice Lurton, in Charlton v. Kelly, 229 U. S. 456, 33 S. Ct. 945, 949, 57 L. Ed. 1279, 46 L. R. A. (N. S.) 397, more clearly states the rule. Mr. Justice Miller uses this language in passing upon a similar Treaty and a similar proceeding:

"Taking this provision of the treaty, and that of the Revised Statutes above recited, we are of opinion that the proceeding before the commissioner is not to be regarded as in the nature of a final trial by which the prisoner could be convicted or acquitted of the crime charged against him, *but rather of the character of those preliminary examinations which take place every day in this country before an examining or committing magistrate for the purpose of determining whether a case is made out which will justify the holding of the accused, either by imprisonment or under bail, to ultimately answer to an indictment, or other proceeding, in which he shall be finally tried upon the charge made against him.* The language of the treaty, which we have cited above, explicitly provides that 'the commission of the crime shall be so established as that the laws of the country in which the fugitive or the person so accused shall be found would justify his or her apprehension and commitment for trial if the crime had been there committed.' This describes the

proceedings in these preliminary examinations as accurately as language can well do it. The act of congress conferring jurisdiction upon the commissioner, or other examining officer, it may be noted in this connection, says that if he deems the evidence sufficient to sustain the charge under the provisions of the treaty he shall certify the same, together with a copy of all the testimony, and issue his warrant for the commitment of the person so charged.

"We are not sitting in this court on the trial of the prisoner, with power to pronounce him guilty and punish him or declare him innocent and acquit him. We are now engaged simply in an inquiry as to whether, under the construction of the act of congress and the treaty entered into between this country and Mexico, there was legal evidence before the commissioner to justify him in exercising his power to commit the person accused to custody to await the requisition of the Mexican government. Omitting much, therefore, that under this view of the case is immaterial, both in the argument of counsel and in the record of the case as it comes before us, the following facts appear to be well established."

The subject is further illuminated by Mr. Justice Lurton by the following language, after quoting from Benson v. McMahon:

"*There is not and cannot well be any uniform rule determining how far an examining magistrate should hear the witnesses produced by an accused person. The proceeding is not a trial.* The issue is confined to the single question of whether the evidence for the state makes a prima facie case of guilt sufficient to make it proper to hold the party for trial. Such committing trials, if they may be called trials in any legal sense, *are usually regulated by local statutes.* Neither can the courts be expected to bring about uniformity of practice as to the right of such an accused person to have his witnesses examined, *since if they are heard, that is the end of the matter, as the ruling cannot be reversed.*

"In this case the magistrate refused to hear evidence of insanity. It is claimed that because he excluded such evidence, the judgment committing appellant for extradition is to be set aside as a nullity, and the accused set at liberty. At most the exclusion was error, not reversible by habeas corpus. To have witnesses produced to contradict the testimony for the prosecution is obviously a very different thing from hearing witnesses for the purpose of *explaining matters* referred to by the witnesses for the government. This distinction was taken by Mr. Justice Washington in the case of United States v. White, 2 Wash. C. C. 29, Fed. Cas. No. 16,685, when he said:

"'Generally speaking, the defendant's witnesses are not examined upon an application to bind him over to answer upon a criminal charge. The defendant's witnesses are never sent to the grand jury, except where the attorney for the prosecution consents thereto. But in this incipient stage of the prosecution, the judge *may examine witnesses who were present at the time when the offense is said to have been committed, to explain what is said by the witnesses for the prosecution;* and the cross-examination of the witnesses for the prosecution is certainly improper.'"

. Under the rule thus laid down, I think it is clear that the testimony of Mertz and Vaccaro, who were present at the time the offense is said to have been committed, should have been, as it was, received, to explain the statements of the witnesses in the depositions of the Canadian government, on the issues of where Bilodeau was killed, whether the killing was an accident, or otherwise justified, as claimed by Mertz, or murder as claimed by the Canadian government.

■ If, as indicated in the opinions quoted, the provisions of the law of Texas are to be looked to, this position is still further sustained. Under the Texas law, Mertz had the unquestioned right to testify in his own behalf. And under the Texas procedure, in examining trials before magistrates, the defendant offers, and the magistrate considers, the testimony of the defendant's witnesses.

■ 3. The evidence shows that Bilodeau was wounded by, and died from, a shot or bullet from Mertz's revolver. While the evidence shows four bullet holes in Bilodeau's overcoat, there was only one bullet wound in his body; this being the one which caused his death.

This brings us to the next question of whether the shot which inflicted such wound was fired *in Canada* or *in the United States.* If in the United States, the effort of the Canadian government to extradite Mertz must fail.

The location of Bilodeau's wound is described in the report of the result of the autopsy in the following words: "A circular punctured wound was found in the abdomen two and one-half inches to the left of the median line and three and one-third inches above

the level of the umbilicus. The body had been embalmed so that the wound could not be made to take its natural shape, but our best measurements indicated the diameter to be in the neighborhood of three-eighths of an inch. The wound extended to the back part of the abdominal cavity, passed through the intestines once, through the mesentery several times, tore open the right common iliac artery and vein, and struck the posterior bony wall of the pelvis a little to the right of the median line. The bone at this place was fractured by the bullet, but not penetrated. Diligent search in the soft tissues for the bullet failed to find it. The direction of the wound was downward, backward and to the right making an angle of fifty-five degrees with the vertical axis of the body and· fifty-five degrees with the lateral axis of the body."

One of the bullet holes in the overcoat is described in such report as follows: "No. 1 Twenty-three and one-half inches from the bottom of the coat. This hole corresponded with the wound in the body. A dark area about three-eighths of an inch wide encircled it. This smudge indicated that the weapon was held fairly close to the coat when discharged."

Price, a witness for the Canadian government, was asked and answered this question:

"Q. How far was Bilodeau from Mertz when the first shot was fired? A. About two or three feet, so near that the powder of the revolver burned his overcoat. The overcoat is in the hands of the American authorities, and will show that I am right."

This is borne out by other evidence.

None of the bullet holes in the overcoat were powder-burned, except the one corresponding to the wound in Bilodeau's body, so that it is reasonable to find, and I do find, that the first shot from Mertz's revolver is the one that wounded, and caused the death of, Bilodeau.

Since it is undisputed that all the events happened within a very short distance of the International Boundary Line, it is not so easy to find whether this first shot was fired on Canadian soil or United States soil.

It is unnecessary to set forth in detail the happenings prior to the arrest of Bilodeau and another (Nadeau) by Mertz and Vaccaro at the Stewartstown Hotel, in Stewartstown, N. H., on May 29, 1925, except to say that Mertz and Vaccaro, United States narcotic officers, were sent by their superior officer, Allen, under an agreement between Allen, and one Cowen, in charge of narcotic investigation for the Canadian government, into Canada, for the purpose of investigating, and causing the apprehension of Bilodeau and one Robert A. Price, who were believed to be engaged in smuggling narcotics, etc., into the United States from Canada. Mertz and Vaccaro, after making the acquaintance of Price and Bilodeau, and going with them to Montreal, Canada, arranged with Bilodeau and Price to buy for them a considerable quantity of narcotics, which narcotics were to be delivered to Mertz and Vaccaro in the United States. When it came to delivering such narcotics, Price declined to enter the United States, but Bilodeau and Nadeau (who apparently became involved in the transaction after its beginning) did deliver such narcotics to Mertz and Vaccaro at the Stewartstown Hotel, in Stewartstown, N. H. Their arrest by Mertz and Vaccaro followed, as has been stated. The arrest of Bilodeau and Nadeau was without a formal warrant, but for a felony committed in the presence of Mertz and Vaccaro.

When Bilodeau and Nadeau entered the United States with the narcotics, Price remained in Canada at a place called the Line House. The Line House was a building on the road between Hereford, Canada, and Canaan, Vt., and the International Line between Canada and the United States passed through a barroom therein. In this barroom, various articles of merchandise were kept for sale and sold, including intoxicating liquor on the Canadian side. After the arrest of Bilodeau and Nadeau, it was decided by Mertz and Vaccaro to incarcerate Nadeau in jail. This was done. Bilodeau claimed, however, that he had been mistreated by Price, and suggested that he accompany Mertz and Vaccaro back to the Line House, for the purpose of inducing Price to come across the International Boundary into the United States, so that he could also be arrested. Mertz and Vaccaro agreed to this, and the three proceeded to the Line House in Bilodeau's car, Bilodeau driving and Vaccaro occupying the front seat with him, with Mertz on the back seat.

Upon their arrival at, or in the vicinity of, the Line House, all parties agree that Vaccaro undertook to arrest Price, and that a scuffle or combat took place between them, in which Price was knocked down, etc. And that practically simultaneously, Bilodeau attempted to escape from the custody of Mertz, and that a scuffle or combat occurred between them, followed by the flight of Bilo-

deau in a northerly direction (into or towards Canada), and that he was followed by Mertz. That during such scuffle or combat, and during such flight, Mertz either accidentally or intentionally fired his revolver four or five times, and that Bilodeau was wounded, as stated, and subsequently died from the wound. Bilodeau, after being wounded, was taken by Mertz in the car of one Parish to a physician who resided some eight or nine miles distant, but died on the way to, or soon after reaching, the physician. His body was then carried by Mertz to an undertaking establishment, etc.

But to return to the discussion of *where* the first shot, which caused Bilodeau's death, was fired. Mertz and Vaccaro claim that, upon arriving with Bilodeau, in Bilodeau's car, at the Line House, they turned the car around, and stopped it on United States soil, being in the state of Vermont. That, in turning the car, it entered Canada, but came out again, and stopped in the United States. Vaccaro says Bilodeau tried to stop in Canada, but that he (Vaccaro) quickly caused the car to speed up and cross into, and stop in, the United States. Price denies that the car stopped in the United States, but testified that it stopped in Canada. The first shot was fired at or near where the car was stopped.

It can only be said with certainty that three persons were immediately present when the first shot was fired. These are Mertz, Vaccaro, and Price. It is claimed by the Canadian government that the witness Alton R. Allan was immediately present. He claims to have been seated in his car near by, at the time. He states that he arrived at the Line House in company with friends, parked his car across the street from the Line House, entered the Line House, remained a short time, and came out again for the purpose of turning his car around and heading it towards the United States. That as he came out of the Line House, he saw Price leaning against one of the posts of the piazza directly in front of the entrance to the barroom, and that as he got into his car across the street, and started to turn the car around, he noticed Price and another (Vaccaro) going in the direction of Canaan (in the United States), scuffling as they went. Both Vaccaro and Mertz testify that when they drove up with Bilodeau, they saw no one except Price. They did not see Allan. Allan places Mertz and Bilodeau, at the time of the first shot, in Canada, some distance from the Boundary Line.

It is also claimed by the Canadian government that the witness Joseph Muscatello was immediately present, but it is not at all certain that he was, or that he was in position to see, or did see, Mertz and Bilodeau when the first shot was fired. A number of other witnesses testify that they were in the barroom, some of them drinking, and came out after the firing of the first shot, and during or after the firing of the subsequent shots, but none of them were situated so as to see where Mertz and Bilodeau were when the first shot was fired.

All these witnesses, and likewise Price, Allan, and Muscatello, testify by deposition, nearly five years after the happening of these incidents, and without cross-examination of any kind or character. A striking thing about their testimony is that it is so mutually corroborative. There are no major disagreements, and few, if any, minor disagreements, although, as stated, nearly five years elapsed between the happening of the events and the giving of their depositions. It is unusual to find such unanimity about such an exciting event. I do not understand that either the treaty or the statutes require me to blindly accept, and without question, testimony produced by a deposition of this character; but that I am to determine the credibility of the witnesses, and the weight to be given their testimony, as in other cases. If the rule be otherwise, why a judicial hearing?

When it comes to Price, and his testimony, it seems undisputed that he is a notorious criminal, and apparently it was he who took the leading part in arranging the automobiles for the photographs attached to the depositions, taken many months after the alleged murder.

On the other hand, Mertz and Vaccaro are interested parties. Their testimony must be viewed as that of persons greatly interested in the outcome of this hearing. Yet, their manner of testifying, both under direct examination, and under a searching cross-examination by able counsel, and the consistency of their story, make their testimony as to the details of this affair, and particularly as to the place where the first shot was fired, convincing. They both testify that the first shot was fired in the United States, and while both Mertz and Bilodeau were in the United States.

A strong corroborative circumstance is that Mertz and Vaccaro agreed with Bilodeau to return to the Line House to induce Price to come into the United States so that they could arrest him, and it is unreasonable to

suppose that they would have stopped Bilodeau's car, in which all three were riding, in Canada if they expected to induce Price to come into the United States. The only purpose of taking Bilodeau to the Line House was to induce Price to come across the line, because, presumably, they had no authority, or supposed they had no authority, to arrest Price in Canada.

Viewing the evidence as presented, both by the Canadian government and by Mertz, I find that the first shot from Mertz's revolver is the one that mortally wounded, and caused the death of, Bilodeau, and that such first shot was fired in the state of Vermont in the United States, and not in Canada. The fact that other shots were fired by Mertz which did not strike the body of Bilodeau, and therefore, of course, did not cause his death, could not render Mertz guilty of murder, notwithstanding that some, or all, of the shots subsequent to the first shot, may have been fired while Mertz and Bilodeau, one or both, were in Canada. It follows that Mertz cannot be extradited to Canada for trial upon the charge of murder.

4. The finding that the shot from Mertz's revolver which wounded, and caused the death of Bilodeau was fired on United States soil, and not in Canada, perhaps makes a further discussion unnecessary, but I take up and discuss one other question. That is, whether the firing of the first shot by Mertz, which caused the death of Bilodeau, was intentional or accidental. If accidental, it is certain that Mertz cannot be guilty of murder, whether the shot was fired in Canada or in the United States.

It will be recalled that none of the several witnesses who were in the barroom at the time of the firing of the first shot were in a position to see Mertz and Bilodeau at such time. The testimony of Allan shows that if he was there at all, he was in his car headed in the direction of. Canaan (in the United States), and that he heard the first shot when it was fired, but did not see Mertz and Bilodeau at that time. Neither did Muscatello see them at that time.

It is undisputed that Price and Vaccaro were, at the time of the firing of the first shot, engaged with each other in a scuffle or combat, in which a razor in the possession of Price, a revolver in the possession of Vaccaro, and Vaccaro's right arm and fist played parts. It is doubtful if either Vaccaro or Price had such a view of Mertz and Bilodeau at the time the first shot was fired, as to be able to determine whether it was accidental or intentional. Bilodeau, of course, is not here to testify. Mertz testifies that when Bilodeau saw Vaccaro and Price in combat, he began to try to escape from his (Mertz's) custody, by jumping about, striking at him, etc. That while Bilodeau was a very much larger man than Mertz, that they engaged in combat, during which Mertz drew his revolver, and that the first shot was accidentally, and not intentionally, discharged from the revolver. I am convinced that this is true. The overcoat of Bilodeau was powder-burned at the place of entrance of the bullet which caused his death. The place of entry of the bullet and the range of the bullet are corroborative circumstances. My finding is that regardless of what were the circumstances under which the second and subsequent shots were fired (which shots did no harm), the first shot which wounded Bilodeau and caused his death was accidentally fired by Mertz.

5. The foregoing disposes of this matter without the necessity of determining the other questions raised in the argument at the bar, presented in the briefs, and apparent from the evidence.

An order will enter, denying the petition of the Canadian government, and discharging Mertz from custody.