UNITED STATES of America ex rel. Tommaso ARGENTO, Petitioner,

v.

Albert JACOBS, United States Marshal and John Doe, Defendants.

Civ. A. No. 34117.

United States District Court
N. D. Ohio, E. D.

Sept. 24, 1959.

Henry C. Lavine, Cleveland, Ohio, for petitioner.

Russell E. Ake, U. S. Atty., Martin A. Rini, Cleveland, Ohio, for defendants.

WEICK, District Judge.

This case is before the Court on a petition and amended petition for a writ of habeas corpus, the return of the United States Marshal, and the evidence.

In 1954, Consul for the Republic of Italy filed a complaint before the United States Commissioner, under Title 18 U.S. C. § 3184, charging petitioner with having committed the crime of murder in Italy on June 3, 1922. The Commissioner issued a warrant for his apprehension and thereafter held hearings which culminated in an order made on or about July 11, 1955 in which he found that petitioner had been charged and convicted of murder in Italy; that there was a proper treaty of extradition, 24 Stat. 1001 and that the evidence as to petitioner's criminality had been established to his satisfaction.[1]

The petitioner was remanded to the custody of the Marshal to await the warrant upon the requisition of the Republic of Italy for his surrender.

During the progress of the hearings before the United States Commissioner, petitioner filed a petition for writ of habeas corpus in this Court, which was denied on May 26, 1955. Argento v. North, D.C., 131 F.Supp. 538. Subsequent to the order of the Commissioner, petitioner filed an action in declaratory judgment in this Court, which was denied December 8, 1955. The judgment in the declaratory judgment action was affirmed by the Court of Appeals, Argento v. Horn, 6 Cir., 1957, 241 F.2d 258, certiorari denied 355 U.S. 818, 78 S.Ct. 23, 2 L.Ed.2d 35, rehearing denied 355 U.S. 885, 78 S.Ct. 145, 2 L.Ed.2d 115.

Both prior actions drew into question the validity of the treaty between the United States and Italy under which the extradition was sought, and in addition, petitioner in the declaratory judgment action, questioned the admissibility of evidence offered at the hearing before the United States Commissioner. The Court of Appeals, in an opinion written by Circuit Judge Stewart (now Justice Stewart) treated the declaratory judgment action as being one for habeas corpus, upheld the validity of the treaty and ruled that the evidence was competent.

In the present action, petitioner claims (a) the evidence offered before the United States Commissioner was insufficient to identify him as one of the defendants who had been tried and convicted in the Italian court and (b) that there was no evidence to sustain the finding of the Commissioner as to criminality.

It would have been better practice for petitioner to have included all of his claims in one habeas corpus action rather than to bring successive actions raising different points in each case. His failure to do so, however, does not preclude the Court from exercising an independent judgment in each successive action. Salinger v. Loisel, 1924, 265 U.S. 224, 44 S.Ct. 519, 68 L.Ed. 989. While the doctrine of res judicata should prevent issues actually decided in a prior action from being relitigated in a subsequent one, this rule ought not to be applied. in a habeas corpus proceeding, where a man's liberty is at stake, to issues which might have been raised in prior proceedings but were not in fact presented, litigated or determined.

The defendants have filed a motion for summary judgment. The statute requires the court to "summarily hear and determine the facts and dispose of the matter as law and justice require." 28 U.S.C. § 2243. The motion for summary judgment, in effect, asks the court to perform its duty under the statute. The Court advised the parties that it would consider the entire case on its merits and each party was given the opportunity to offer additional evidence.

On the issue of identification, in my judgment there was ample evidence to support the Commissioner's finding. Petitioner was one of the defendants who were tried and convicted in Italy, in absentia, of the crime of murder. The au-

1. The treaty provided for a hearing before any competent judicial magistrate "so that the evidence of his or her criminality may be heard and considered."

thenticated record of the Italian trial described him as Tommaso Argento, son of Salvatore of Ioppolo, Italy. That petitioner is in fact the son of Salvatore and came from Ioppolo, Italy was shown by information contained in Department of Justice records, consisting of his alien registration form and application for certificate of identification, which were offered in evidence before the Commissioner. His photograph attached to the application for registration was also identified in statements under oath of the Italian witnesses Onofrio Sacco, Antonino Sacco and Giuseppe Camilleri. Another photograph was identified by the Commandant of the Police Station in Ioppolo, Italy. While two of these witnesses, namely, Onofrio Sacco and Antonino Sacco, in later affidavits stated that they had no knowledge concerning petitioner's trial and conviction of murder, they did not dispute their identification of petitioner, by his photograph, as being the son of Salvatore Argento of Ioppolo, Italy. There is no proof as to the existence of more than one Tommaso Argento, son of Salvatore of Ioppolo, Italy. Furthermore, the affidavits of Giuseppe Camilleri and the Commandant of the Ioppolo Police Station stand uncontradicted. Even if the affidavits of the Saccos' were disregarded, the affidavits of Giuseppe Camilleri and the Commandant of the Police were at least sufficient to make out a prima facie case as to identification which, in the absence of proof to the contrary, the Court must accept as true.

The petitioner did not take the stand and offered no proof to refute the evidence as to identification.

Petitioner was tried and convicted in absentia by the Italian court in 1931. He has been in the United States since 1926, emigrating here under an assumed name similar to that of the murdered victim. His conduct, while living here for over thirty-three years, has been good.

If the order of the United States Commissioner is upheld, petitioner will be surrendered to the Italian authorities and his life sentence put into effect. He will not be given an opportunity to defend himself on the charge of murder.

While this procedure of trial of a defendant, in absentia, on a criminal charge, particularly one as serious as murder, does not comport with our ideas of justice or fairness, it must be remembered that petitioner is an Italian National and alleged to be a fugitive from that country. The offense was committed in Italy and is governed by Italian law which permits the trial of a criminal case in absentia.

■ Petitioner's conviction, however, having been rendered in absentia, this Court must inquire into the evidence of criminality, as extradition is not warranted simply by a showing of the in absentia conviction. 35 C.J.S. Extradition § 39f.

The evidence before the Commissioner of criminality consisted of three items:

(1) statements under oath of three residents of petitioner's home town in Italy

(2) the suspicious circumstances of his having entered the United States under an assumed name

(3) evidence contained in a translated record of the Italian trial proceedings. · . .

Each of these items will be considered and their collective import evaluated.

The statements under oath were originally made by Onofrio and Antonino Sacco, brothers, and by Father Giuseppe Camilleri, brother of the deceased. All three statements are essentially the same, and read:

I have known personally Tommaso Argento, son of Salvatore, who was born at Ioppolo Giancaxio, convicted in absentia and sentenced to life imprisonment by the Court of Assizes, October 11, 1931, for premeditated murder of Giovanni Camilleri, and having viewed the photograph here attached, state that in the same, I recognize the aforesaid Tommaso Argento, son of Salvatore, and that,

therefore, the aforesaid photograph is that of Tommaso Argento, son of Salvatore, himself.

These affidavits contained only the statements of the affiants that Tommaso Argento, son of Salvatore, had been tried and convicted in absentia for the murder of Giovanni Camilleri. They contained no statement of any facts showing proof of criminality, establishing the conviction as a just one or any statement that the affiants witnessed the commission of the crime.

Whatever weight those affidavits might have carried has been further weakened during the course of these proceedings. Later affidavits have been obtained from the Sacco brothers, in which they disclaim any knowledge of the crime or trial proceedings.

Petitioner's entry into the United States under the assumed name of Giovanni Camilleri is undoubtedly a peculiar circumstance. Its weight as evidence of criminality will be considered hereafter.

The next matter for consideration is the evidence contained in the record of the Italian trial proceedings. Only the evidence relating to petitioner's complicity will be considered.

At the outset, it should be noted that in some instances two statements from each "witness" appear in the record. One is an examination without oath, while the second is labelled a "deposition". The depositions were apparently witnessed, but they do not state whether the witness was sworn and the Court can only assume that they were. In any event, nowhere in the record is there any cross-examination of the "witnesses", probing the accuracy or veracity of their accounts. Therefore, the evidence stands in its most favorable light to the state.

Angelo Mangiovi stated that he suspected petitioner of being implicated in the crime because on the day of the killing he did not appear to divide a bean crop, and four days later when he saw petitioner he seemed quite worried. Also, it had been petitioner's habit to practice shooting at rocks in the past.

Father Giuseppe Camilleri, brother of the deceased, made a statement in which he said that it became notorious soon after the crime that three material authors of the killing were Tommaso Argento, son of Salvatore, Angelo Salvatore, son of Giosafat, and Alfonso Argento, son of Giuseppe. It is clear that any information Father Camilleri had of the killing itself was strictly hearsay.

The two statements in the record given by Giovanna Infantino are conflicting. In the first she stated that on the day preceding the killing she heard petitioner tell another man that the head of Giovanni Camilleri "had to have been crashed." In her second statement she said that it was on the day of, and after the time of, the killing that the statement was made, and that petitioner himself had told her of Camilleri's death.

Her husband, Vincenzo Moncada, confirmed Giovanna's statement, including her uncertainty as to the date of the conversation. However, he added to his statement the fact that on the day of June 3, 1922 when petitioner came to his field he was armed with a shotgun, Mod. 91 (the same type as was used in the killing). His wife's statements contained no reference to petitioner having been armed.

Affidavits of these two individuals, taken February 7, 1959, have been presented on behalf of petitioner. Both affidavits state that the facts contained in the statements were completely false, and made in response to extreme pressure by exponents of the Facist Party and that they were forced to sustain the accusations in order to avoid repercussions of a political character.

The depositions of Giovanni Vecchio, Angelo Argento and Onofrio Burgio are of the most importance.

Giovanni Vecchio stated that on June 3, 1922, at about 11 o'clock, he heard shots coming from the hill of Acqua Solita and looked in that direction. He saw a man running, being fired at from behind. The man fell, and soon thereafter three men appeared, fired two more

shots into the pursued's body, took possession of the deceased's rifle, struck his head with a rifle stock, and fled. The distance from where Vecchi stood to the place of the crime was about 150 meters (roughly 500'). From that distance he was unable to identify the three assailants. Shortly thereafter Vecchio went to his orchard and from there saw four men coming from the direction where the crime had been committed. At a distance of about 60 meters (about 200') he recognized two of the men, one of whom was petitioner. He stated that "probably they were armed with rifles, but I could not see them because they were walking through the wheat and they might have had them in the hands."

Defendants contend that his statement also identifies petitioner as having been armed with a rifle in "his right hand". This is incorrect. It was the deceased, whom he called the "fugitive man" that Vecchio identified as being armed with the rifle.

Vecchio is now deceased, but affidavits of his sons Giuseppe and Caligro, and of four of his clients were presented on behalf of petitioner. These affidavits state that until his death in 1935 Giovanni Vecchio had great remorse for the statements he made against Tommaso Argento, son of Salvatore, and that he in fact knew nothing of the killing. Everything he had declared was entirely false and he was forced to do so because of his fear that he would be harmed by the Facists if he did not.

Angelo Argento stated that he too was working in the fields in the vicinity of the killing and heard rifle shots. At a distance of about 170 meters (about 565') he saw four individuals, all armed, hurrying in the direction of the "Di Nina house". Petitioner, he said, was one of the four. However, Argento also said that he saw three other individuals on the spot where the crime had been perpetrated at about the same time. He could not tell if this latter group was armed.

Onofrio Burgio's statements covered two distinct happenings. The first transpired a year before the killing. At that time, petitioner and three others were pursuing the victim Giovanni Camilleri. They were all armed. A fued had arisen over land boundaries, but with the intervention of an outsider the dispute was thereupon settled amicably. Burgio's recollection of the events of the day of the killing were that a half hour before the murder the deceased had been by his house, and he was followed at a distance by Tommaso Argento, who was on the back of his mule.

This identification of Tommaso Argento is questioned. In Italy, where certain names are quite common, a person is identified generically, such as John Smith, son of Robert. There were two Tommaso Argentos implicated in this killing. Petitioner is the son of Salvatore, the other was the son of the late Gaspare, and was alleged to be the head of the local mafia. Earlier in Burgio's statement he referred to a third Tommaso Argento, the son of Giuseppe, who apparently was not implicated in the killing.

This is the sum total of the evidence against petitioner.

The law of the place where the accused is found furnishes the rule as to what evidence is necessary to authorize extradition, Pettit v. Walshe, 194 U.S. 205, 24 S.Ct. 657, 48 L.Ed. 938, generally being evidence affording a reasonable ground to believe that the accused is guilty of the offense charged. Fernandez v. Phillips, 1925, 268 U.S. 311, 45 S.Ct. 541, 69 L.Ed. 970; Collier v. Vaccaro, 4 Cir., 1931, 51 F.2d 17; 35 C.J.S. Extradition § 39f.

The rules of the place where the crime was committed control as to the admissibility of evidence. Hearsay evidence being competent in the Italian tribunals it can be considered herein. However, the hearsay character of a statement is a factor to be considered in determining the weight to be accorded it. United States ex rel. Klein v. Mulligan, 2 Cir., 1931, 50 F.2d 687. Likewise, the court may determine the weight to be given testimony presented by depositions. Ex-

tradition of Mertz, D.C.S.D.Tex.1931, 52 F.2d 241.

The affidavits of the Sacco brothers, as evidence of criminality, are virtually worthless, having been retracted in so far as they relate to the crime, and standing only as personal identification.

Likewise, the affidavit of Father Giuseppe Camilleri is entitled to little weight. Although it states that petitioner was convicted of the crime it fails to show his connection therewith, and is only a conclusion of criminality on the part of Father Camilleri. In light of the trial record, which shows that Father Camilleri's only knowledge of the crime itself was gained by hearsay and speculation this affidavit is very poor evidence indeed.

The matter of petitioner's using the name of Giovanni Camilleri to gain entrance to the United States is quite puzzling. On the one hand, it can be asked why he failed to use his right name, if he was not hiding from something. On the other hand, it can be said that it would be ludicrous for a murderer to assume a name similar to that of his victim if he was trying to avoid detection. It is my opinion that his false entry proves nothing, one way or another with respect to the crime.

As to the evidence in the trial record, the statements of Giovanna Infantino and Vincenzo Moncada are, in my opinion, virtually worthless. In the first place, they have been recanted by the individuals as completely false. In the second place, they were not definite as to the day in question. If the statement attributed to petitioner was uttered after the crime it could be considered as merely relating a past event.

The statements of Angelo Mangiovi are so totally lacking in probative value as to be entirely disregarded. It is his own opinion based strictly on conjecture.

Onofrio Burgio's statements add little to any evidence of petitioner's criminality. The quarrel of the year before was resolved peacefully, and there was no evidence of continued hard feelings thereafter. The identification of Tommaso Argento, who was following the deceased shortly before the murder, is inconclusive. In light of the fact that there were two different Tommaso Argentos charged with the killing, and Burgio's statements brought a third Tommaso Argento into the picture, I am unwilling to accept this statement as a conclusive identification of the petitioner, in the absence of a generic qualification of the general identification of Tommaso Argento.

This leaves the statements of Giovanni Vecchio and Angelo Argento.

The potential weight of Vecchio's statements are weakened by the affidavits presented stating that he many times said that his testimony against petitioner was false and given under Facist pressure. Examining the statements' contents, they show that Vecchio claimed to have seen the killing perpetrated by three men, whom he was unable to identify at a distance of 500 feet. Subsequently, he saw petitioner and three others, or a total of four, coming from the direction of the killing, but was unable to tell if they were armed because they were in a field of growing wheat.

Angelo Argento did not see the pursuit or the shooting. After the occurrence he saw four men, allegedly armed, moving away from the scene of the shooting. He claims to have been able to identify the group and see they were armed, although he was about 65 feet further from the scene than was Vecchio, who could not identify the men until they were only 200 feet from him. And while Vecchio was unable to see if the men were armed because they were walking through a field of growing wheat, Argento claimed to see them carrying guns, although he too viewed them in a wheat field.

Perhaps the most important feature of Argento's statement is his identification of the two distinct groups of men, one of three and one of four. He places petitioner in the group of four men moving away from the place of the killing. At the same time he places a group of three men at the scene of the crime. Here it

becomes very important that Vecchio saw the killing perpetrated by three men and stated that when he saw petitioner thereafter he was in a group of four.

If credence is given to the statements of both Vecchio and Argento it is entirely feasible that petitioner was in a group of four men in the vicinity of the killing, but that the murder itself was committed by another, independent, three man conspiracy.

To my point of view, the only evidence worthy of any substantial consideration against petitioner is that he was in the vicinity of the crime in the company of three other men, and that possibly all four were armed. However, the only possible eye-witness to the killing said that it was carried out by three men, another witness also saw three men on the scene, and petitioner was not identified as being one of that group.

The mere fact that a person is seen in the vicinity of the commission of a crime is not sufficient evidence of his complicity in said crime. Cf. United States v. Di Re, 1948, 332 U.S. 581, 593, 68 S.Ct. 222, 92 L.Ed. 210; Hicks v. United States, 1893, 150 U.S. 442, 451, 14 S.Ct. 144, 37 L.Ed. 1137.

The murder, committed in 1922, was not reported to the Italian police or investigated by them until 1927. Petitioner left Italy in 1926. The trial in Italy took place in 1931.

While flight from the scene of a crime may be considered as evidence of guilt, there is no proof here that petitioner fled. He did not leave Italy until nearly four years after the crime had been committed. When he left, no charges were pending against him.

The evidence at the trial consisted entirely of sworn and unsworn statements of witnesses taken ex parte by the authorities, in the absence of the accused, who had no notice or knowledge of the taking of the statements or of the trial.

Not only would this evidence be inadmissible in this country, but in my judgment, if it were admitted, it would be insufficient to sustain a conviction for murder.

Recognizing fully the right of the Republic of Italy, under the treaty, to extradite its subjects to make them answer to a criminal charge, it is something else where the extradition, in effect, seeks to execute on an in absentia conviction. In such a case the Court must scrutinize the evidence carefully to determine at least a reasonable probability that the petitioner was guilty of the crime.

In my judgment, there was not sufficient evidence to warrant a reasonable belief that petitioner was guilty of the crime of murder, and the Commissioner's finding to the contrary is not supported by the evidence.

This memorandum is adopted as findings of fact and conclusions of law. The motion for summary judgment is denied; the petition for writ of habeas corpus is granted and the petitioner is ordered discharged. An order may be prepared in accordance with this memorandum.